I think probably the Supreme Court in Peyton v. New York in 1980 said it best when they said the Fourth Amendment has drawn a firm line at the entrance to the House. What happened in this case was the police led Mr. Washington into his house, sat him on his bed, told him, you know, sign the consent form, it'll so save us from going to get a warrant from the court, which the police knew they couldn't get. And while they're asking him this, they're already searching his house. But they were in an apartment, would they? It was a residential motel, Your Honor. It was a one-room, one-room studio apartment basically. So they're already in there, depending on which office. How did they get in? Did he give them permission? I couldn't figure out. The record was a little bit unclear about how they ended up in his room. Well, they kept him outside in the hallway. Down the hall. Six officers, five of them fully uniformed, in other words, guns and batons, one playing close. And they're saying to him, look, these people are coming out of their apartment. Let's go inside and talk. Let's go inside and talk. Three times he's told, let's go inside and talk. Three times he's told he has an arrestable charge, which is a misdemeanor warrant. And he, when he's talking to them, he's saying, okay, sure. And then saying, could you please close the door? Could I wait for my wife to come? When he's out in the hall. When he's out in the hall. You know, my wife tells me I never make myself clear when I set out the facts. Well, I think he was being fairly clear that he did not want the police in his apartment, in his home. And the police pretty much ignored what he wanted. Well, he shut the door when he walked out. He shut the door immediately when he came out. And they heard somebody else inside. And they called for that gentleman to come out. He came out. He left the door open. And Mr. Washington said, could someone please close the door? And the officer answered him, no, I like it open. And at that point, they started, like under Windsor, doing a visual search of his room. They said, oh, hmm, no, I like that door open. Is that a gun on the bed? And Mr. Washington responded, no, that's a pager. And so they're already visually searching what, in effect, is a one-room studio apartment. They're seeing everything there is to see at that point that's visible, you know, plain view. Okay. So the next step that I'm, it's just not clear on the record. Did they walk, did they then walk into the room altogether? Or did he say, let's go into the room? Or did they say, can we go in the room? They never clearly asked for his consent. They said, let's, they just kept saying, let's go inside and talk. Let's go inside and talk. And three times Mr. Washington attempted not to go inside his room with the officers. And finally he was, under the police words, let in. He was let into his room, sat down on the bed, and told, why don't you go ahead and sign the consent, save us getting a warrant. After they had testified at the suppression hearing that they had no reasonable suspicion and certainly no probable cause to get a warrant, and that's why they didn't get one to begin with. And they don't claim any exigent circumstances? They claim no exigent circumstances, Your Honor. Well, this was the one where he went, they came, he got, the police got a tip, right? This was a, this all, right. It all started out at a Winco shopping center. Somebody had shoplifted 100 bottles of pseudoephedrine. This woman tipped off the officers that there was a Shane Leffingwell living on the third floor of the Comstock who had a meth lab running. On the 15th, wasn't it? And then she said, well, there's somewhere on the 15th floor that may be selling. Yeah. So the officers, one officer goes to the Comstock, finds out indeed Shane Leffingwell does not live there. He's been evicted. So right there, the CI is wrong. But then they go on to say, well, how about the 15th floor? Anything going on on the 15th floor? And the court says, well, 1520 floor has a lot of phone calls and foot traffic. A lot of traffic and phone calls. Exactly. Yeah. Is that reasonable suspicion under the circumstances, considering her first tip was wrong? I don't think so. In any case, the officer goes back, runs Mr. Washington and his wife, Moira Jami, I hope I'm pronouncing that right, run their names through the system, through NCIC, and come up with a very old use conviction for Mr. Washington, an old sealed weapon conviction. Now don't whisper. I can't hear you. An old sealed weapon conviction, an old concealed weapon conviction and an old, excuse me, use of drugs conviction for Mr. Washington. Now his wife came up with an old trafficking conviction. So that's what they had when they went there. And the police said, we didn't have, we couldn't get a warrant on this. We couldn't get a warrant. Wasn't there an outstanding warrant for his, for some offense? Yes, Your Honor. There was a, there's a little bit of interplay here as to whether it was a misdemeanor warrant or a felony warrant. If it was a misdemeanor warrant, that doesn't survive the Fourth Amendment. You can't. Would that have permitted a custodial arrest and then a security sweep of the area once they heard the person inside? Had the government advanced that argument in this appeal, which I think it has not? No, it has not. Well, first of all, they took him 30 feet away from his apartment. So if they were going to arrest him, they had a right to search. And they did do a Terry search, Pat's search of him, and he had nothing on him at all, nothing. If it was an outstanding warrant, that would have supported a custodial arrest, wouldn't it? And under a custodial arrest in this circuit, couldn't they have done a security sweep of the room that would have netted him the same thing that they found anyway or not? I don't know. I would think so, Your Honor, because if it was a misdemeanor ---- Well, this is just failure to register. Is that what we're talking about? Yes. He failed to change his address with ---- He had registered, but he had failed to change his address when he moved to Devanstock. The officer told him a number of times that that's an arrestable charge. Arrestable charge. Arrestable charge. But he also told the judge at the suppression hearing that it was also just a ticket, a warning, a ticket. And he could have ---- he never told Mr. Washington he could write him up for that. He just kept telling him it's an arrestable charge, it's an arrestable charge. And since it was a misdemeanor, misdemeanors do not overrule Fourth Amendment and I was going to give you the ---- It was a misdemeanor. Yes. And he had committed the misdemeanor and he could have been arrested right then, right? He could have been, but under Welsh v. Wisconsin from 1984 Supreme Court case, when the underlying offense is only a misdemeanor, law enforcement must yield to the Fourth Amendment in all but the rarest of cases. And I submit this is not a really rare case. You have a gentleman surrounded by six officers, three of which are kept out of sight of the doorway to avoid the coercion defense. What does that tell you? Does that tell you they're there really for a knock and talk? No, sir. That tells you they're there. They had decided before they got there they were going to search his room. Sir, I'd like to ---- Well, he eventually signed a, you know, an authorization to search. With three to six officers standing over him, yes, sir. I'd like to reserve two minutes for rebuttal time. Thank you. May it please the Court, Your Honors. My name is Craig Denny. I'm from the U.S. Attorney's Office in Reno. Your Honor, Your Honors, the facts of the case, I think Judge Reed, the district court judge, he found this to be a very difficult case as he went through the suppression hearing, which when you read the facts, you might think this would have been a couple hours of a hearing, and it actually went on for two days. And Judge Reed's findings went on for 20 pages in analyzing what had happened. The officers were, in fact, responding to a report of a possible meth lab at the Comstock Hotel. They had a tip from somebody they had apprehended stealing pseudoephedrine, which is a precursor chemical used in the manufacture of methamphetamine. And the information was that there was an individual by the name of Shane, has particular room on the third floor at the Comstock. What room number was that? I believe it was room 324 if I'm not mistaken. Yeah. Then they also had information from this person they had apprehended that there was sales of meth taking place on the 15th floor, but they didn't have a particular name. So the officers followed up on the tip when they arrived at the hotel. Did that person tell them that there was a – there was a whatever they called it, cooking operation going on the 15th floor? Your Honor, I believe that the record, it was more that the meth – I think it was that the production was taking place on the third floor and that it was either – it was either production or sales taking place on the 15th floor. Okay. All right. When they responded there, they found out that this person named Shane had been in the room that he'd been evicted by the hotel. The record's unclear as to why he was evicted. I think there's some – one of the officers mentioned something about that he had trashed the room, which could have been for the meth production, but who knows. But they do talk to the hotel clerk and ask about the 15th floor of, you know, is there anything happening up there. And the clerk says a large amount of foot traffic, substantial number of calls. Those facts by themselves might seem right and somewhat innocuous to myself or to anyone on the street. However, the officers who investigate drug trafficking cases know that cases involving, you know, small sales of methamphetamine to users will – there will be phone calls constantly being made and people coming in and out of the hotel room. So they, again, decided to follow up on the information. But before they did, they wanted to find out who this individual was up in room 1524, I believe. And it was Mr. Washington. Did the clerk give him a specific room where there was a lot of foot traffic and … Yes, Your Honor. The clerk provided it was room 1524. Well, the clerk knew who was in there. Yes, Your Honor. The – and the clerk, it said it was Mr. Washington. So then the officers decided to run his criminal history, found out that he did have a conviction dealing with drugs and one for firearms. When was that? I don't – I don't remember the year of the conviction, Your Honor. I don't – I don't know if they testified to that at the hearing. I'm sure it's in the … So they got – they got some more stuff. So they – they end up going upstairs to do what they testified to, is knock and talk. And they go up there, and I believe the officer's testimony is he knocks on the door and asks Mr. Washington to come outside. Didn't come across in the – the evidence that was presented at the hearing that they pounded on the door and said, police, come out with your hands up, or that they had guns drawn or anything like that. So he came out. Yes, Your Honor. He came out of the door and then shut the door behind him, which the officer thought was suspicious. They thought he – he was trying to prevent them from seeing what was inside of the hotel. Why is that suspicious? Well, the officers heard that there's possibly meth sales or meth trafficking taking place. So they – so the officer, you know, considering all these facts together and his training experience, may have felt that. Just his actions, they seemed – maybe he didn't want them to see what was inside the room itself. What's wrong with that? I mean, I just … A couple of people come to my house. I go outside. I close the door. I mean, we all do. It's possibly, Your Honor, but I'm sure you don't. You don't? I do, Your Honor, but I don't hang out at the Comstock involving meth sales. The Comstock. I'm sorry, Your Honor? What's wrong with the Comstock? Well, apparently the officers have had experience in going there and – and stopping methamphetamine labs or sales. So was it a known drug – drug house? I don't know. I don't know if there's testimony of that in the record. I can say we have a number of cases that come out of that location. But regardless, Mr. Washington does, in fact, come out. And then the record is – is very lengthy on this. We have an audio tape that's somewhat indecipherable of all the sequence of events. But the officers have testified that they felt that Mr. Washington had agreed to go back inside with them. The district court found that the consent in the hall went down. Where did you say I agreed to go inside? It's not specifically stated that way. I read that twice. Your Honor, I think that's why Judge Reed, the district court, found that that wasn't an oral consent to go back in the room. I mean, it had six officers there, right? Is that right? Well, there were six officers there, but only three were actually speaking with the defendant. The other three were down the hall. But there were six guys there. Correct, Your Honor. Yeah, officers. They all had guns. And – and one of them, I forget the guy's name, kept telling him, you know, you – you didn't register, and that's an arrestable offense. I mean, you know, the implication is we can bust you right now, see. I think – I think Judge Reed recognized that. Yeah. And – and then they were asking questions, and they were cajoling him and – and going through a whole process over there. I think that's wrong. I went through it, looked at it. And, Your Honor, the surprising thing is when you read through the lengthy transcript, the process for them arriving there was 8.30 p.m., and the time that the consent – written consent form got signed was 8.45. But listening – looking at the record of it, it did seem like it was, I think, a longer period than it actually was. Well, he didn't sign the consent form until they went in the house. That's correct, Your Honor. Yeah. And the consent form didn't – didn't say that – didn't – didn't tell him that he could refuse consent, did it? It actually did, Your Honor. Well, not – not – where did it say that? I think Judge Reed actually specifically cited the language that was in the consent form. And I – it was in the government supplemental exhibit of record was a copy of the form itself. The Court's indulgence. Well, I mean, it – it – he's signing the one permissive – permission to search. Right. The undersigned resigning at 200 West 2nd Street, 1524 Reno is hereby voluntarily authorized Officer Ty Serene and other officers may designate to assist him to search my residence located at the same place. And it says, and I further authorize it to remove from my residence real estate and or motor vehicle, whatever documents, items, or property. And where does it say that he can deny those officers? He doesn't have to give them anything. I believe it would have been the last paragraph, which was reading, I'm giving this written permission to these officers freely and voluntarily without any threats or promises having been made, and having been informed by said officer that I have the right to refuse this search and or seizure. All right. That's your right. Okay. So, Your Honor, the – what it all comes down to is the totality of the circumstances. And I think that's why the district court went through 20 pages of the record on a, you know, a knock-and-talk case involving a search of a hotel room. The court felt that the oral acquiescence of the defendant in the hallway wasn't an oral consent to search the room. However, he found that the officers – it wasn't tied. Them going inside the room with the defendant. He wasn't in handcuffs. He wasn't at gunpoint. They went inside, sat down, gave him the opportunity to read the report. He was surrounded by six police. Well, actually, Your Honor, the evidence that this – I think he could have said, sayonara, I'm going to go and have lunch. Well, Your Honor, the evidence was that there were three of the officers had stepped inside. However, the defendant was not in handcuffs. There was no officer who had his gun drawn. The defendant has had contact with law enforcement in the past. He could have simply said no or refused to sign the form. He never stated that to the officers. He did mention to them, well, wait till my wife gets here. But nothing to the fact that, no, you're not going to search my room. The officers showed him the form. He read the form. The form said he had the right to refuse consent, and he signed the form. Well, they used – they used other techniques, didn't they, in this transcript? Didn't they say other things to him that – They mentioned – – has to be better for him. And I think one of the officers talks about, you know, he wants to do this very quick. He doesn't want to – He doesn't want to be bothered. Yeah, we don't want to bother him. And I think Judge Reed recognized that. You know, that cuts against the government's case, because you're looking at the totality of the facts and – You don't want to give us any trouble, you know. Yeah. We don't want to be bothered going down to get a search warrant. Too much hassle. Your Honor, if I was perhaps being consulted as the prosecutor asked by the officers and they wanted to talk about it, I don't think I would have given that advice for them to make that suggestion to the defendant. However, these cases are very fact-intensive. And I think Judge Reed is looking at that point, cutting against the government, but also looking at the fact that this individual signed the written consent form, didn't say no. Well, he didn't sign it right away. He signed it after they were out there working on him for a while. Well, the – we're talking about a span of 15 minutes from the time they first  That's a long time, you know. I mean, they – you know, they could have put some surveillance on that room, talked to people as they came out. Ideally, Your Honor, that would have been the better way to go. There would have been some respect for the Fourth Amendment, wouldn't it? Perhaps, Your Honor. But I think that the question in this case would be, did the court, making its findings, did it err? I think Judge Reed did examine all the facts and did find this to be, you know, not a clear-cut case, a very difficult close call case. But he found that the government had met its burden in establishing that the defendant had voluntarily and knowingly signed the consent to search his room. And if he didn't want to, he simply could have said no or not signed the form. If there aren't any other questions, Your Honor, I will submit. Yeah. Well, what are the – aren't there certain factors we need to look at to determine whether – whether this consent is voluntary? Yes, Your Honor. That would be under the Castillo case that this Court had decided one of the factors it would deal with is the person in custody. Did the officers have their guns drawn? Yeah. Well, it wasn't. Was he in custody? The government's position is he was not in custody, Your Honor. But he was in this narrow hall, and he's got six police over there, and five of them have guns. Well, actually, the officers did have firearms. None of them had unholstered any of their firearms. No, but they're there. It doesn't take long to do that. And what's the other one? The question of – there's another factor is, has the defendant been advised of his right to refuse consent? And in this case, the written consent form did advise him that he had the right to refuse consent. Well, that's after he let them in. That's correct, Your Honor. They didn't advise him before they sort of, you know, talked their way in there. It's after he sat down and gave them his form to sign. That's true. Another factor is – Was that part taped? I think it was, wasn't it? I'm sorry, Your Honor. He signed the consent form. Was that taped? It's kind of difficult to determine. They're talking to him. It looks like they're talking about something, and then the defendant mentions that he's left-handed. And they don't actually – I mean, there's – the officer is explaining what the consent form says to him, but I don't know if there's what other reference would be. Another factor would be if the, you know, is the individual in custody or had Miranda warnings been issued. The officers admitted that they didn't advise him of Miranda warnings. The defense also cites the Tompkins case, which is out of Fifth Circuit, where they list some additional factors. And I found it interesting in that case where the officer specifically told the subject, if I don't have a – if you don't let me search, I'm going to go get a warrant. Well, in the Tompkins case, they found that that didn't invalidate the consent to search, and they – I think that's one of the factors that we consider. Yes, Your Honor. And they also said, consider the – I'm sorry, Your Honor. Kim case. Yes, Your Honor. Consider the intelligence of the individual. Mr. Washington, I believe the presense report said he had 11th grade education. Apparently, you know, was able to read the form, understand the form. Well, how do we know that? There was nothing in the record to indicate that he didn't. They gave him the opportunity to read it. And also the fact that he's had experience with law enforcement. Have you read the form? I'm sorry, Your Honor. Did they ask him if he had read the form, if he had any questions? I can't – I'm not sure if the record actually lists that out, specific exchange. But it all comes down to the totality of circumstances. None of those factors individually are dispositive. Judge Reed, I believe, analyzed the facts at length. That's why his findings are so detailed and so lengthy. And we believe that his decision should be affirmed. Thank you, Your Honor. All right. Any rebuttal? Your Honors, if I might, I'd like to read a couple of Judge Reed's rulings to you. Judge Reed ruled that in a Terry stop, which is what I think the situation was, as long as Mr. Washington was sitting on the bed there, it was okay. So he's analogizing bringing Washington into his own home and sitting him on the bed to a Terry stop. He also tells in his ruling that reason – Well, you know, I know Judge Reed. He's a good judge and he's conscientious. He struggled with it. So – Well, he also says that reasonable suspicion is sufficient to enter someone's home. But the most important thing that he didn't do in his analysis is he did not tell in his ruling what the intervening event was that vitiated the initial illegality of entering that room. He didn't give one reason except that he signed a consent form. And I believe in Judge Paez, just in December, on the Collin case, you had said that that was insufficient to get rid of a Fourth Amendment taint. So we have a Fourth Amendment taint. Maybe you will find we had a Fifth Amendment consent. I don't think it was there, but we certainly have a Fourth Amendment taint that is not vitiated by anything, by any intervening time, space or event, which is what is required to make this an okay search. Also, they were searching before – I'm sorry? Go ahead. Oh. They were searching the room visually, which is wrong under Windsor. I'm just going to finish my statement. And they also were searching the room and picking up things and looking at things before they even asked him to sign the consent. And I'll just leave it at that. Thank you, Your Honor. Was this U.S. v. John Jimenez, was that called to Judge Reed's attention? By the attorney in the district court, I do not know. I believe it was, though, in the suppression motion. You don't know. But I couldn't tell you for sure. I believe that's where I got it from. All right. Thank you. Thank you. The matter is submitted. U.S. v. Ray Charles Smith.
judges: Pregerson, Beam, Paez